]No. 1557.]

ROBERT PHELPS *v.* THE STATE.

1. MURDER—EVIDENCE—FACT CASE.—See this case for the state of proof *held* not only to sustain the conviction for murder in the first degree, but sufficient to exclude any hypothesis of a less degree of culpable homicide, as well as any pretense of justification.

2. ACTS AND DECLARATIONS OF CO-CONSPIRATORS.—Separate indictments for the murder of one B. were preferred against L., M., and the appellant. At the trial of the appellant, and over his objection, the court below admitted in evidence the acts and declarations of M., prior to and at the time of the homicide, and also his acts and exclamations immediately after its perpetration, while he and the appellant were fleeing together from the scene. Note the state of proof *held* sufficient to show such complicity between M. and the appellant as justified the admission in evidence of the acts and declarations of M. prior to and at the time of the homicide. *Held,* further, that the subsequent acts and exclamations of M. were admissible as *res gestæ.*

3. CONTINUANCE.—The defense asked a continuance for want of the testimony of L., whose case, it was alleged, had been continued by the State. against his consent, and for the purpose of forestalling his acquittal and the use of his testimony in behalf of the appellant. *Held,* that the court below correctly overruled the application, for reasons already elucidated, in the companion case of *Moore* v. *The State, ante,* page 1.

4. SAME.—The refusal of a continuance is not error on appeal, if the desired testimony, when tested by the light of the evidence adduced at the trial, is not probably true, nor its import such as would have affected the character of the inculpatory act, or the result of the trial.

APPEAL from the District Court of Hunt. Tried below before the Hon. G. J. Clark.

On the third of January, 1883, in the village of Commerce, Hunt county, an affray occurred in which one Sam. Boyd was fatally shot and instantly killed. Within a few days the grand jury of the county presented three separate indictments, respectively charging George Moore, John Lindley, and Phelps, the present appellant, with the murder of Boyd. At the ensuing July term of the District Court of Hunt county, the cases of Moore and the appellant were tried, and each case resulted in a conviction for murder in the first degree, with a life term in the penitentiary. The case of Lindley, it seems, was continued on ap-

plication of the State. Appeals were taken in the cases of Moore and the present appellant. At page 1 of the present volume will be found the case of Moore, which was reversed and remanded. In the present case, as will be seen, the judgment is affirmed for reasons which are held to distinguish it from the case of Moore, and which necessitate a statement of the evidence in this case, notwithstanding it was for the most part elicited from the same witnesses in both cases, and in most of the details is substantially concurrent in both cases. It was in proof that George Moore and the appellant were double first cousins, had been raised together, and were very intimate friends. They, as well as Boyd, the deceased, were residents of Hunt county at the time of the affray. Moore and Boyd, it appears, were acquaintances, but it seems that Boyd and the appellant were not. The affray which resulted in the death of Boyd occurred late in the afternoon of January 3, 1883, close to an establishment called the Blair saloon, which stands on the south side of a public square in the village of Commerce, and is contiguous to the store of one Ablowitch, of which the testimony occasionally speaks.

Mal. Woods, who was a near neighbor of Boyd, and a cousin of the latter's wife, testifying for the State, said that late in the afternoon of the day of the homicide he met Boyd in Commerce and asked him if he was ready to go home. Boyd said he was, and witness went to the Blair saloon to get his saddlebags. Boyd started, but stopped, and witness next saw him at the back end of Ablowitch's store. Just as witness and Boyd started off, witness said he had to go to Rutland's store, across the square, and did so. Returning from there, he found Boyd talking to Ablowitch. Witness spoke to Boyd, who turned, or was in the act of turning, when George Moore came around the Blair saloon, and, speaking to Boyd, said: "Sam., come here." Boyd said: "What do you want?" Moore replied: "Come and see; I want to see you a minute." Boyd said: "I am not afraid to come." At this minute Phelps (the appellant) and Lindley came around the corner of the house, and Boyd rode up to Moore. The latter asked Boyd if he had anything against him. Boyd told him no, and asked him if he had anything against him; and Moore said no. Then Moore said: "I can whip you." Boyd replied: "I see no occasion for a difficulty; there is nothing between us." Moore said: "I can whip you, anyhow." Boyd replied: "If nothing else will do you, and you will wait

till I get down, I will give you the best I've got in my shop;" and then he rode to the horse rack and dismounted. Witness then went to Boyd and told him he was not going back there; telling Boyd: "Those fellows are drinking, and you are not going." Then Boyd got on his horse, and he and witness started toward home. There was some cursing, and Boyd started back. Moore, Lindley and the appellant passed around the house, out of witness's view, and then the witness said to Boyd: "Now, let's go and leave them." Then there was more cursing from the corner of the house, and some one said: "Go, you d—d cowardly son of a bitch," and Boyd turned and rode back. Witness and Boyd were then some thirty or forty yards from the house, in the direction toward their homes. Witness followed Boyd. Moore had his pistol in his hand, and Boyd was nearly on a line between Moore and the witness. When Boyd got some ten or fifteen feet of Moore, the latter presented his pistol, and Boyd dodged. Moore did not then fire, but the witness dodged. The second time Moore presented his pistol, Boyd caught it and Moore wrung it out of Boyd's hand, and they passed out of witness's sight, around the southeast corner of Blair's saloon. Then the witness heard a pistol shot in the direction they had gone. Witness next saw Phelps (the appellant) in a southeast direction from the corner of the house, with a pistol in his hand. Phelps raised his pistol and fired in the direction Moore and Boyd had gone; he held the pistol in both hands and took deliberate aim. At the report of the pistol the witness's horse took fright and dodged, and witness rode around to the front of Blair's saloon and dismounted, and then went back and found Boyd down. Witness heard but two reports after the shot fired by Phelps (the appellant). Moore's horse was hitched on the southeast corner of the square, and the appellant's on the east side and behind the house. They went to their horses and mounted, and as they left town the witness heard Moore say: "Shoot and be d—d." This was about a minute after the killing. All the time after Moore came around the house he had his hand in his breast pocket. Boyd was saying nothing when he last started off. Witness could not say who the persons were who were cursing in the rear of Blair's saloon. He knew Phelps, the appellant, at the time, but could not recognize his voice as one of those he heard. Moore was twenty or twenty-five feet from Boyd when the witness first saw the former's pis-

tol. Witness did not have hold of Boyd's bridle-rein when the latter turned back the last time.

On cross-examination, the witness stated that when he went into Blair's saloon to get his saddle-bags, Moore and Phelps and several others were in there. Moore was talking to John Lindley, and Phelps, the appellant was standing close to them. After repeating much of his statements on his examination in chief, the witness stated that he could not remember hearing the appellant say anything the day of the homicide.

Mack Blair, for the State, testified to what he saw of the affray. He was a clerk in the Blair saloon on January 3, 1883, and late in the afternoon, while George Moore and appellant, besides others, were there, the deceased rode up to the front or north door and spoke to witness, when George Moore called the deceased a d——d liar. Deceased made some reply, which witness could not recall. Moore and John Lindley were together at the time. Witness next observed Moore, Lindley and appellant standing outside and in rear of the saloon. Deceased was then at a horse rack, south of the house. Witness heard Moore cursing, and heard him call the deceased a d——d son of a b——h, and tell him he was afraid to come back. Deceased said he would come back or die. When Boyd rode back the appellant was there. Speaking to Moore, Boyd said he did not know what he, Moore, had against him, but if he had anything to shoot with, it was time he was using it. Boyd had his quirt wrapped around his right hand, and advanced on Moore with the quirt drawn in a striking position. Moore backed, and Phelps, the appellant, stepped to one side. Boyd rode his horse up on Moore, and was grabbing at Moore's pistol when the latter fired. Boyd continued grabbing at Moore's pistol, when Phelps, the appellant, fired, and shot Boyd in the back. Boyd fell off his horse on Moore, and witness saw the blood running from Boyd's mouth. Boyd and Moore continued to fight, and Phelps, the appellant, ran around a shop and shot Boyd again, while the latter and Moore were still fighting. Boyd lived but a short time after this shot, which was fired when his side was turned towards Phelps.

Recurring to the beginning of the affair, the witness stated that when Boyd went away from the front door of the saloon, he, the witness, told Moore that if he had a difficulty with Boyd, the latter would make it serious with him; to which Moore replied that "It didn't make a d——d bit of difference—that's what we want." Witness could not say that the appellant heard this,

or that he was present at the immediate time. In the morning of the same day, Moore came into the saloon and called for a drink. Witness asked him if that was the first drink he had taken. He said: "Yes; but woe be unto the last one." Moore then sat down and remarked that he could kill a man and get a thousand miles away. If appellant was there at that time, the witness did not observe him. In a little while Moore spread his money out on the counter, and said he had plenty to take him wherever he wanted to go.

On cross-examination the witness said that appellant and Moore were drinking that day. He did not hear either of them mention Boyd's name during the day. In Moore's talk in the morning he did not say he had killed or would kill a man, but that he could kill a man and get a thousand miles away; and witness made no reply to the remark. After repeating much of his testimony in chief, the witness said that Boyd, when he advanced on Moore, rode his horse's head past the latter, who backed around the corner of the house. Moore's first shot did not check Boyd at all. Witness did not hear the appellant say anything. Moore told Boyd not to come on to him with that quirt. If Boyd struck Moore, or got hold of Moore's pistol, the witness did not see it; but Boyd was grabbing at the pistol and had his quirt in a striking position when Moore fired the first shot. Phelps was then standing off in the rear of Boyd, and fired, and Boyd fell off his horse on Moore. Boyd and Moore were still scuffling when Phelps fired his second shot. Moore and the witness had had a little difficulty a short time previous, but had talked it over. Recurring again to the beginning of the difficulty, the witness said that, after Boyd rode away from the front door, he noticed Moore and John Lindley standing together near the door, and Lindley, patting Moore on the back, said: "Go for him, G—d d—n him; I've got plenty of money to back you." Witness could not say what they were talking about.

L. Wilkins, for the State, testified to several circumstances previously stated by Blair, and then said that, in the afternoon of the day of the killing, he saw Moore and the appellant come into Blair's saloon together. Joe Swayne asked Moore to join him in a drink, and, as Moore did not come at once, Swayne called him a d—d hair-lipped, or hair-brained, fool. Moore said he didn't take that from any man, and, running his right hand in the left breast pocket of his coat, started at Swayne. Phelps

4

caught Moore and said: "That is not the man we are after."
Moore then cursed Phelps, and said he was not standing up to
him. Phelps replied: "I have not gone back on you; I'm with
you. What are you getting so drunk and acting the fool for?
That is not the man we are after; we don't want to camp on the
trail to-night." It was not more than twenty minutes there-
after until Boyd came to the front door, and after Boyd left the
front door, Mack Blair told Moore to shut his mouth; that Sam.
Boyd was not talking to him; and that if he got into it with
Boyd it would be serious. Moore replied: "It don't make a
d—d bit of difference; that's just what we want." Phelps and
Lindley were then present. Phelps was saying nothing. Wit-
ness told Moore that if they got into any difficulty they had
to get out of there. Moore, Lindley and Phelps went out of the
east door together, and were all together at the back end of the
saloon when witness heard cursing out there. Boyd rode back
and asked Moore what he had against him. Moore replied that
it didn't make a d—d bit of difference, he could whip him.
Afterwards, as Boyd was riding off, Moore called him a d—d
cowardly son of a bitch; at which Boyd turned, and, with his
quirt drawn, rode back on to Moore, who backed out of the wit-
ness's view. The witness, it is inferable, heard but did not see
the shooting.

On his cross-examination, the witness, after repeating several
of his previous statements, said that Moore, as Boyd advanced
upon him, said "don't strike me with that loaded quirt."

W. Winton, testifying for the State, said he was acquainted
with all the parties to the affray in which Boyd was killed, and
was present during the day and at the time the homicide occur-
red. He heard Moore call Boyd "a d—d son of a bitch." Then
Boyd started back, and Phelps, the appellant, said "D—n him,
if that's his game, let him come; I'm at your back." Moore shot
first, and Phelps next. Witness did not think that Moore's first
shot struck the deceased, but saw blood after the appellant fired.
Moore told Boyd at least twice not to come on him with a loaded
quirt. Witness did not see appellant shoot but the one time, and
did not remember seeing Phelps go around the blacksmith shop,
and thought he would have seen him if he had done so. Witness
thought that nearly all the crowd in Commerce that day were
drunk. The rest of this witness's testimony was but corrobora-
tive of statements made by others, and already detailed. This

seems to have been the last witness examined by the State in chief.

Robert Long was the first witness for the defense. He knew all the parties to the affray, and was connected with none of them. On the day of the affray which resulted in the death of Boyd, he first saw the deceased, Boyd, in Donaldson's saloon, in Commerce, about three o'clock in the afternoon. Moore came in and stepped up to the bar, and Boyd said he would have to burst "this G—d d—d quirt over his (Moore's) head." It was a rawhide quirt, home made, and had a Mexican knot tied in it. It was neither a very heavy nor a particularly light quirt. At the Blair saloon, when Boyd came to the door, he spoke to some one, and said "hoh," or "hey." Moore made some reply, and they got to quarreling. Witness heard them cursing each other, and when Boyd went to the horse rack witness went to him and told him to get on his horse and go home. Boyd said, "all right," got on his horse and started off, but turned back to Moore. Witness had then returned to Moore, and was talking to him; and when Boyd came up, witness jerked his horse back, and Mal. Woods and LeRoy James came up and got Boyd to go off. As Boyd rode off he and Moore were still cursing each other. Moore called Boyd a d—d cowardly son of a bitch, and then Boyd came back in a trot, came up to Moore, and said: "G—d d—n you, if you have got anything you had better be using it." Boyd had his quirt drawn, and Moore told him not to come on him with that loaded quirt. Witness tried to pass under the horse's head, so that he could use his right hand, being crippled in his left, and about the time he got straight Moore fired and Boyd struck. Then Boyd struck again and hit Moore over the eye. Then Phelps, the appellant, fired from behind Boyd, and the latter fell off his horse, and as he fell he caught Moore around the neck with his left hand, and witness saw blood spurt from his mouth. Boyd and Moore were still fighting, and Phelps fired again. All the parties were drinking, and Moore was pretty drunk; witness saw him stagger and fall down only a few minutes before the difficulty. Boyd was over six feet in height, and weighed about a hundred and seventy-five pounds. He had the name of being a pretty good man as to strength. During the cursing between Moore and Boyd, the witness heard Phelps say nothing. When he, Phelps, fired his first shot, some parties started toward Moore and Boyd, and Phelps then presented his pistol and said "hands off."

Jim Walden, for the defense, testified that while Moore was standing in Blair's saloon, he, Moore, remarked that he could whip any man who had anything against him. Boyd replied, "You are d—d liar; by G—d, I am the change for you." Moore started to Boyd, and Boyd tried to get down off his horse, but was prevented by Bob Walden. Boyd afterwards rode to the horse rack, and from there advanced on Moore, with the lash of his quirt wrapped around his hand. Moore told him not to hit him with that loaded quirt. Boyd still advanced, and Moore backed and told Boyd twice not to come on to him. Boyd struck at Moore with the quirt, and Moore fired, and witness did not see Moore's pistol until then. Boyd, as he rode at Moore, was all the time trying to hit him. Witness heard a second shot, and then Boyd fell off his horse on Moore, and they scuffled around, and Moore fired another shot. Boyd continued striking at Moore with his quirt, and got Moore down, and then Moore shot again.

On his cross-examination, the witness stated that Moore was his brother-in-law. He did not know who started the difficulty. There were but three shots fired, of which Moore fired two and Phelps one.

Several other witnesses were introduced and examined by the prosecution and defense, but their testimony, except that hereafter given, would add little or nothing of a material character. Not the slightest circumstance indicated that Phelps, the appellant, was the object of any violent or menacing act or word on the part of the deceased, nor indeed, that the deceased had any cause to apprehend violence from appellant until the latter shot him. The deceased neither used nor exhibited any other weapon than the Mexican riding whip, known as a quirt. Moore and the appellant escaped to the State of Arkansas, and were captured there and brought back for trial. Several witnesses for the defense stated that the reputation of the deceased, when drinking, was that of an overbearing man, easy to take offense, and of a resolute temper.

Asa Jernigan, in rebuttal for the State, testified that he was in the village of Commerce the day Boyd was killed, and saw the bullet holes. One was in the sink of the neck, in front; one between the shoulders; one in the small of the back; and there was a glancing shot on the side. About a half or three-quarters of an hour before the killing the witness rode up to where George Moore and one Rector were trading horses. Moore

asked the witness about the Rector horse, and witness replied that he thought it was a good horse. Moore said that was the kind of a horse he wanted; that he had been arrested and fined for nothing, and that the next time he left he was going to leave for something. He said that the boys told him that the Rector horse was a horse of good bottom, and that was what he wanted; that when he got on that horse he could get to the brush, and there were not officers enough in Commerce to catch him. Prior to that, and during Christmas week, 1882, the witness heard an altercation between Moore and Boyd at Donaldson's saloon in Commerce. Boyd came to the door, and, speaking to the witness, said, "Asa, I want a drink." Moore, who was in the saloon, said, " By G—d, I am drinking, and you can't drink here." Boyd replied, "It don't matter a d—n; I drink where I d—n please." Boyd took a drink and said to Moore: "You are in the habit of running over the boys around here, but you can't run over me. If you want to tackle a man you can run over, you'd better tackle somebody else." Witness told Boyd there was nothing between them, and no use for a row; and Boyd replied that he didn't want a row, but that Moore couldn't run over him. Witness thought this took place the night after Christmas, 1882, which was eight or nine days before the homicide. On cross-examination, he said if Phelps was then present, or present at the horse trade between Moore and Rector, he, the witness, did not see him. The testimony of this witness discloses the only apparent cause for ill-will between Moore and the deceased.

It was in proof that Moore and the appellant had been making their arrangements to leave Hunt county and go to Western Texas, where they had relatives, and that they had agreed to start on the day of the homicide. It was also in proof that they lived near each other, and usually came to Commerce together; that they did so the day of the homicide, and were seen in close and private conference prior to that event.

*E. W. Terhune, Perkins & Gilbert,* and *Brooks & Looney,* for the appellant, filed very able and ingenious arguments, both on the submission of the cause and in support of a motion for a rehearing.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   This case is a companion to that of *George Moore* v. *The State*, the judgment in which was reversed and the cause remanded at a former day of this term.   Phelps and Moore were separately indicted and tried for the murder of Sam. Boyd, and were each convicted of murder in the first degree, with the penalty assessed at confinement in the penitentiary for life.

While the two convictions are for the same criminal act, the evidence upon which they are based, and the legal questions involved, are essentially distinct and dissimilar in several material respects.   We shall not discuss in detail the numerous errors assigned and ably argued, both orally and by briefs.   Our view of the facts of the case, in our judgment, renders immaterial and inapplicable many of these questions.

In order that we may arrive more directly and intelligibly at a decision of this case, we will first state the conclusions of fact which we have deduced from the evidence as presented in the record.

This defendant and George Moore were relatives and intimate and confidential friends and associates.   They were in the town of Commerce together on the occasion of the first altercation between Moore and Boyd, which occurred a few days before the homicide, and had private conferences together immediately after that altercation.   They had agreed to leave the county and go west together.   They came into Commerce together on the day of the homicide, armed with six shooters, and remained together, drinking and carousing, and together they provoked a difficulty with the deceased, and together they shot and killed him.   Having accomplished the death of Boyd, they left Commerce together, and together they fled the country.   They were together and acting together from the inception to the termination of the tragedy, and even up to the time of their arrest in another State; and during the transactions of that fatal day of the killing, this defendant appears to have been the adviser, and to a considerable extent the controller, of his companion Moore.

2.   This defendant, without any provocation directed toward him, coolly and deliberately shot the deceased in the back, inflicting a mortal wound, which caused the deceased to fall from his horse.   Not satisfied with this, he coolly and deliberately, while deceased was engaged in a death struggle with Moore,

shot him a second time in the back, inflicting another mortal wound.

3. When deceased was advancing upon Moore, in a threatening manner, this defendant, instead of endeavoring in a peaceable way to prevent the impending danger, encouraged, invited and incited the deceased to continue the attack upon Moore, and immediately placed himself in readiness to shoot and kill the deceased.

4. The attack by Boyd upon Moore was not of that character which made it reasonably appear that it was being made with the purpose and intent on the part of Boyd to murder or maim, etc. It was not shown that the quirt, the instrument with which Boyd was assaulting Moore, was a deadly or even a dangerous weapon, calculated to produce death, or even serious bodily harm; while, on the other hand, it was shown that Moore was well prepared to meet the attack of Boyd, being armed with a six shooter, and in a favorable position to use the same to advantage.

Finding the facts of the case as above summarized, we are of the opinion that, in so far as relates to this defendant, he is beyond reasonable doubt guilty of murder in the first degree, as found by the verdict of the jury. We cannot see that the evidence raises the issues of justifiable homicide, manslaughter, or even murder in the second degree.

. We think the court did not err in refusing his application to continue the case. Lindley was not a competent witness for him, as decided in Moore's case. (*Ante,* 1.) The facts which he stated he expected to prove by the other witnesses do not appear, from the other evidence in the case, to have been probably true, and, even if true, would not, we think, have changed the character of the homicide, or affected the result of the trial. There was no evidence admitted which, in our opinion, was not clearly competent. Moore's acts, declarations and motives, prior to and at the time of the killing, were admissible against defendant, because, in the opinion of the trial judge and in our opinion, the evidence sufficiently showed that it was their common design and purpose to accomplish the death of Boyd. They were connected, and, as it were, so closely consolidated, with each other by the testimony, as to make the acts and declarations of one those of the other. As to the acts and declarations of Moore immediately after the killing, while fleeing from the scene of the killing in company with this defendant, they were

clearly a part of the *res gestœ*, and were admissible as such, if upon no other ground.

Many objections are urged by defendant's counsel to the charge of the court. We regard the charge, taken altogether, as a very able and explicit exposition of the law of the case, and in some respects more favorable to the defendant than he was entitled to under the facts. It may be, as was remarked in Moore's case, that the language of the charge, in treating of express malice, was not as critically correct as it should have been, and that there was more prominence given to express malice than would in some instances be proper; still we think the charge embraced nothing but sound propositions of law, which were pertinent to the evidence, and there is no such error in the charge as was reasonably calculated to prejudice the rights of the defendant. As before remarked, we are of the opinion that the facts of this case did not raise the issues of justifiable homicide, manslaughter, or even murder in the second degree; and yet the trial judge gave the defendant the benefit of instructions upon justifiable homicide and murder in the second degree.

We have carefully and thoroughly examined every question presented in the record on behalf of defendant, and we conclude that no substantial error appears in the proceedings, trial and conviction. We are of the opinion that the defendant has been accorded a fair and impartial trial, and that, in accordance with the evidence and the law, he has been not only legally but justly convicted of murder in the first degree.

The judgment is affirmed.

*Affirmed.*

Opinion delivered November 10, 1883.